### A. H. BULL S. S. CO. v. UNITED STATES. THE CLARE. NATIONAL SUGAR REFINING CO. OF NEW JERSEY v. UNITED STATES. THE CHINOOK.

District Court, S. D. New York. December 7, 1928.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for libelant.

Charles H. Tuttle, U. S. Atty., of New York City (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

KNOX, District Judge. On the morning of February 17, 1926, the steamer Clare, owned by A. H. Bull Steamship Company, was in collision with the United States army dredge Chinook in New York Harbor. Both vessels were injured, and the owner of each has sued the other, or her owner, for the damages sustained. The National Sugar Refining Company, owner of some cargo on the Clare, which was damaged, has intervened in the libel filed by A. H. Bull Steamship Company against the United States of America, as owner of the Chinook.

The Clare is a freighter of 3,379 gross tons, and 2,131 net. She has a length of 325 feet, and a beam of 46. She was inward bound from San Juan, Porto Rico, and was making for Pier 27, Brooklyn. Prior to coming to the point of collision in the upper bay, she had been anchored at quarantine. Having passed inspection there, she hove up her anchor at 9:06 a. m., Eastern standard time, and started towards her pier, with her master, third officer, and a helmsman on the bridge. The weather was clear and a light northwesterly breeze was blowing. The tide was flood, and was running at a rate of 1½ knots.

The Chart of New York Harbor shows a buoy designated as bell "22" (Occw). It is known as the Owl's Head Buoy. It is situated on the easterly edge of the main ship channel nearly opposite the St. George ferry slips on Staten Island, and about 2½ miles from quarantine. The Clare, according to her witnesses, proceeded well on her own starboard side of the channel; it being the intention of her captain, when the vessel had rounded Owl's Head Buoy to the westward, to shape her course for Nun Buoy 24, also on the easterly edge of the ship channel, but a considerable distance to the northward of Owl's Head Buoy. Beginning at a point some distance to the south of the latter, and continuing to the north of Nun Buoy 24,

the channel bears to the northeast. Shortly after leaving quarantine, the Clare had Owl's Head Buoy about a point on her starboard bow.. As the vessel proceeded, her course was altered so as to head towards the buoy with the purpose of passing it to starboard. In order to round the buoy, she had to change her course 2½ points to starboard. The speed at which the Clare was moving is variously estimated by the witnesses from both sides, and it is probably safe to say she was making between 8 and 9 knots. As a matter of fact, the master thinks she was making 8 knots, which, with the tide, would amount to 9½ knots. Somewhat opposed to this is the testimony of an assistant engineer of the Clare, who thinks the Clare was not moving at more than 6 or 7 knots per hour. Captain La Rue of the ferryboat Albany, which figures in the mishap that ensued, also says the Clare was coming in "very slowly." A moment after the ship changed her heading to round Owl's Head Buoy, the Chinook was observed ahead in the main ship channel, and somewhat on the Clare's starboard bow. It may here be remarked that the dredge was formerly the army transport U. S. Grant and bears slight, if any, resemblance to the ordinary dredge.

The version of the occurrences of the next few minutes, as given by the Clare's witnesses, indicates that while they did not know if the Chinook was bound for the Staten Island shore, or to sea, they were of opinion that, if each vessel kept her course, a safe passing would be effected. It was thought, also, that whatever may have been the intention of the Chinook, the duty of the Clare was to keep to starboard. In line with this thought, the freighter blew a one-blast signal to the dredge. At this moment, the Chinook's officers estimate the Clare was about a half mile off, and bearing about two points on the dredge's port bow. The master of the Chinook had seen the Clare from the time she was at quarantine. When the blast was blown, the Clare was, according to her estimates, about a quarter of a mile south of Owl's Head Buoy. The signal was heard by the officers of the Chinook, but Captain Howard of that boat, thinking he was too far off to be the object of the blast, and that it was intended for a ferryboat crossing from Staten Island towards Brooklyn, turned to his third mate and said, "he" (the signaling officer of the Clare) "certainly couldn't be blowing to us but we won't take any chances."

A better understanding of what happened may possibly be had if the prior situation of the Chinook should here be stated. She had been dredging on the easterly side of the channel a short distance above Owl's Head Buoy. Her hoppers being full, she lifted her drags, hauled down her shapes, sent a launch ashore, and got ready for sea. This was about 9:20 a. m. At that time, the engines of the dredge were put at full speed ahead, and the helm placed at starboard so as to round the buoy, and head down the channel to sea. The vessel was then about 150 feet above Owl's Head Buoy and about 150 or 200 feet to the westward. Following the testimony of Captain Howard, the engines must have been going ahead for a minute or so before the signal from the Clare was heard, and his vessel was swinging to port. He then went back on his starboard engine, and stopped the port, in order to check the swing. At about the same instant, he realized a dangerous situation to be impending, and blew three blasts on the Chinook's whistle to indicate that she was backing. At this, the Clare, says the Chinook, changed her heading towards the port side of the dredge. She was then a quarter of a mile away. In attempting to give the facts, as Captain Howard related them in the courtroom, it is better, I think, to quote from his testimony:

"When he blew his whistle he ported his helm; afterwards he starboarded, and when I saw he was going to our port—port to port —why I stopped backing the starboard engine and backed on the port engine so as to keep her from swinging around toward his course, the starboard engine going ahead * * *, my heading was changing * * * after she starboarded she was about a point on the port bow and blew no signals when she starboarded; we could see his course change, and also that his rudder was over to the port side. This was just a few seconds before the collision occurred. Her engine was then going astern, and she was about a ship's length away. When I saw her start to swing under a starboard helm and swing towards me, I stopped the starboard engine and went back on the port engine to keep her from swinging broadside to him, so as to reduce the surface which she could strike. She struck with the bluff of her port bow about a hundred feet from the bow on the port side, tearing off all our outrigging and doing considerable damage to the hull. I had sternway at the time of collision because when she (Clare) hit the pipe line and tore the rigger and outrigger, the engine room shut off her steam, which let her starboard drag drop and break off, which would have been impossible to do if she had any headway at all and had steerage way."

The Clare's statement of the facts, other than as already given, is that though the dredge made no reply to the one one-blast signal, she was headed southwesterly, and as the freighter was swinging away from the Chinook's heading, it was not thought necessary to repeat the blast. The Chinook continued in a southwesterly course for a little while, then she was seen to swing suddenly to port. The Clare, realizing that a reversal of her engines would throw the vessel to starboard across the changed heading of the dredge, put her helm astarboard. The bow then pointed away from the Chinook, but the latter then went to starboard, and blew a danger signal, followed by one blast. Having done so, she hard aported, and reversed her engines full speed astern. The collision followed, the time probably being between 9:23 and 9:26 a. m.

Based upon the foregoing version of the events leading up to the accident, the record is filled with charges of fault and counterfault against the respective vessels. These are accompanied by statements of each ship, from which I am asked to find that her officers exercised a high degree of good seamanship. The finding easiest to make is that two vessels, in broad daylight, with a wide channel in which to navigate, staggered into each other in the fashion of two drunken men. Under such circumstances, resistance to a presumption of fault on the part of both vessels is difficult, and an analysis of the stories confirms the presumption that the foregoing recital suggests.

As supporting the charge that the Chinook failed to keep a proper lookout, reference may be had to the assumption by the master of the dredge that the Clare's one-blast signal was intended for a passing ferryboat, while some suggestion is made that more than one ferryboat was passing in the vicinity, I find there is no basis for it. So far as persuasive testimony goes, the Albany was the only ferryboat concerned. As previously stated, she was passing from St. George to Sixty-Ninth street, Brooklyn, and was therefore on a course crossing that of the Clare. The Albany being 700 to 1,000 feet northward from the Clare, and the latter being the privileged vessel, the ferryboat was required to obtain consent to pass ahead. She did this by blowing two blasts to the Clare. She assented to the proposal by responding with a similar signal. The witnesses from both the ferryboat and the Clare agree in saying that the freighter did not blow one-blast signal before the Albany crossed her bow. Such signal would have been directly contrary to the maneuver that was executed with the Albany. Had the Clare blown a blast signal to a ferryboat, other than the Albany, within two or three minutes of the collision, there should be better evidence of the fact than that a boat was scheduled to leave St. George at a time that might have brought it to a position where a signal from the Clare might be required.

The captain of the Chinook seems not to have appreciated the actual distance that separated the vessels when the blast on the Clare was blown. First, he thought the freighter was so far away that the Chinook could not be concerned. He was, however, somewhat apprehensive, and did not intend "to take any chances." In consequence, he endeavored to stop the swing of his vessel to port. If the Clare was still a half mile off, and if the Chinook was merely stemming the tide, as she says, a response should have been made to the one-blast signal. Either an assent or a dissent would have enabled the Clare to act so as to avoid collision. If the Clare was only a quarter of a mile away when her signal came, and the Chinook felt that the proposed maneuver was improper and impossible of execution, a danger signal was in order, together with an immediate reversal of both of the Chinook's engines. Instead of doing any of these things, the dredge proceeded to move first in one direction and then in another. Meanwhile, the space within which the vessels might clear steadily and quickly lessened to the vanishing point.

As for the faults of the Clare, it is to be recalled that although she received no assent to her passing signal, and notwithstanding the change of the Chinook's heading, followed by another which was quite enough to give rise to the thought that there was confusion in the mind of the officer in charge of the dredge, no further signal was blown, and there was no reduction in the speed. The Clare had reason to sense danger when some 1,500 feet from the Chinook. Whether a reversal of the Clare's engines to full speed astern would have given her actual sternway within that distance may be open to some doubt; but, if accompanied by a proper signal, followed by an alarm, there is a reasonable probability that no collision would have occurred. These matters, in my judgment, constitute culpable faults on the part of the freighter.

Argument is made that the Clare should be held solely at fault as a result of her failure to observe the rules of the road, and particularly the Nineteenth Inland Rule. 33

USCA § 204. As to the latter, I shall not attempt a decision. The testimony as to headings, at or about the time of the one-blast signal, is in such conflict as to make a conclusion on this branch of the dispute little better than a guess. Other features of the case are quite ample for a decision. Beyond those to which I have referred, it may be said that the Clare, like the Chinook, did not maintain a proper lookout. Had she done so, there would be no basis for her testimony to the effect that the Chinook was proceeding at a 9-knot speed—a statement that is refuted by the fact that one of her dredging pipes knocked off by the collision was found within a few lengths of where the dredge had been working. This is fairly good proof that she was barely getting under way over the ground just prior to the moment of collision. The Clare also thought that the Chinook, when first observed, was about three-quarters of a mile north of Owl's Head Buoy—an obviously inaccurate observation. It would have been seen, too, that the Chinook was under little headway. Assuming the statements in regard to the movements of the Clare to be believed by the persons on the Clare, who made them, it is clear that proper attention was not given to the Chinook and her movements by those who were charged with the responsibility of doing so.

A further fault of the Chinook is that she was proceeding southward on the wrong side of the channel. She should have been over beyond its center before heading to sea. Undoubtedly, she was on her own port hand side of the channel, and it was her intention to proceed to sea in that fashion. Otherwise, her bow would have been pointed more to the westward. Furthermore, it was the opinion of the Chinook's master that irrespective of Inland Water Rule 25 (33 USCA § 210) and rule 4 of Inland Pilot Rules, he was permitted to go down either side of the channel as he saw fit. See La Bretagne (C. C. A.) 179 F. 286. So far as the Clare's position in the channel is concerned, it is not open to criticism.

A perusal of this record compels a finding that both vessels were at fault. A proper appreciation by each of the presence of the other—a fact that was nonexistent due to inattention—would have avoided the injury sustained by both; and it seems to me that a decree for half damages should be passed. This disposition will also apply to the claim of the American Sugar Refining Company, although in the first instance the Clare is responsible for the loss of the sugar.